PHILIP GENDRON

*vs.*

ROBERT K. BURNHAM

KEEPER OF CUMBERLAND COUNTY JAIL

Cumberland.   Opinion, July 16, 1951.

388

*Wilfred A. Hay,*

*Gendron, Fenderson and McDougal,*

*Armand Gendron,* for petitioner.

*Alexander A. LaFleur, Attorney General,*

*William H. Niehoff, Assistant Attorney General,*

*Daniel C. McDonald, County Attorney,* for respondent.

SITTING: MURCHIE, C. J., THAXTER, FELLOWS, MERRILL, NULTY, WILLIAMSON, JJ.

MERRILL, J. On report. Writ of habeas corpus certified to Chief Justice for immediate decision by the justices upon findings of fact by a Justice of the Superior Court and by agreement of the parties in accord with the procedure employed in *Welch* v. *Sheriff,* 95 Me. 451 and *Wade* v. *Warden,* 145 Me. 120, 73 Atl. (2nd) 128.

The prisoner, in obedience to a subpoena, appeared and was sworn as a witness before the grand jury in session at the May Term of the Superior Court for the County of Cumberland on the 18th day of May, 1951. The record discloses twenty-five questions which were asked him while before the grand jury. Of these questions he answered eight and declined to answer seventeen. Of the seventeen questions which he declined to answer, to nine of them he specifically asserted his privilege against self incrimination as the basis therefor. The grand jury thereafterwards reported the questions and answers to the court by an affidavit signed and sworn to by their foreman, in which affidavit the grand jury prayed that the prisoner should be ordered to appear before the Superior Court to show cause why he should not be adjudged in contempt of court for refusing to make answer to said questions. To this complaint the prisoner,

the then respondent, filed an answer in writing, under oath, in which, after setting forth his own recollection of the questions and answers, he stated:

"2. That the respondent at all times has been, and is now, ready and willing to answer such questions as will not tend to incriminate him, that in so doing he has at all times, and is now, ready and willing to accept the judgment of this Honorable Court as to what questions he should answer and as to what questions he may properly and rightfully claim his privilege against self-incrimination;

3. That in every instance in which, in his examination before and by the Grand Jury, the respondent has declined to answer a question, he has declined in the honest belief that the answer might tend to incriminate him; that in all such instances he felt, in his personal judgment, that the answer would be substantially dangerous to him from the standpoint of self-incrimination; that in so exercising his judgment he acted in good faith and to the best of his ability; that the danger of self-incrimination in answering such questions as he declined to answer, he, the respondent, felt was proximate and real and not imaginary, fanciful or remote;

4. That the respondent has at all times had, and now has, every desire to cooperate with this Honorable Court and with the Grand Jury, and to answer any and all questions which this Honorable Court or the Grand Jury may propound to him, subject only to his constitutional right to decline to answer on the ground of self-incrimination, and, further, that in the exercise of this right he has at all times, and is now, ready and willing to abide by the decision of this Honorable Court as to whether or not, in any case or as to any question or questions, he may have the right to decline to answer on the ground that the answer or answers may tend to incriminate him."

At the hearing before the single justice on the contempt charge, the prisoner took the position that it was an adversary proceeding and that the State must make out its case. Whereupon, the following proceedings were had:

"THE COURT: I have here an affidavit signed by the foreman of the grand jury, setting out questions and answers given by this respondent, sworn to by Mr. Murphy. On the strength of that I will rule the State has made out a prima facie case, at least. You may give your defense and I will be glad to hear it.

MR. GENDRON: We will except to that, if the Court please, and will offer an answer in writing under oath.

THE COURT: Do you wish to put on any evidence?

MR. GENDRON: If the Court will take our answer and consider the facts in the answer as proven — in such case —

THE COURT: I will not accept it."

Thereafterwards, the prisoner, the then respondent was duly sworn, examined, and cross-examined. With respect to each and every question which he had declined to answer he testified under oath that he had declined to answer on the ground that he might incriminate himself, although he admitted that he may not have announced to the grand jury the ground of his declination except as to nine questions as shown in the affidavit. The prisoner further stated with respect to all questions which he refused to answer that when he was before the grand jury he believed in good faith that answers to the questions might tend to incriminate him.

In the hearing before the justice in the contempt proceeding, the position of the prisoner was stated as follows by his counsel:

"MR. GENDRON: Very well, Your Honor. So as to make sure that our position is clear, if the Court please, on the record, we want to make an offer of

proof in this connection. We want to offer to prove with respect to the question of incrimination, in connection with the question which this witness refused or declined to answer before the grand jury, that the answer to that question would tend to incriminate the witness, would tend to give the State evidence implicating him in a criminal activity; our position being, of course, that this witness before the grand jury—and I assume that is the position of the Court—has the privilege of refusing to answer questions if the answer to any question, or the question concerning which he claims his privilege might incriminate him.

THE COURT: Do you think it is for him to decide?

MR. GENDRON: I think, if the Court please, before the grand jury there is no other person to decide that question. The witness must decide the question before the grand jury for himself.

THE COURT: That decision is binding and final?

MR. GENDRON: It is not binding and final, if the Court please. I think the next step, if the grand jury believes that the refusal to testify is unreasonable, the next step is for the grand jury to bring the witness before the Court to decide upon the subject matter as laid before the Court by the grand jury and explanations given by the witness, whether or not there is a real danger that the testimony might incriminate the witness. I think it is—I think then at that point if the Judge —

THE COURT: Is this an argument of —

MR. GENDRON: No. You have asked us to state our position. I think it is quite fundamental, if the Court please. I think then if the Court decides that the witness should answer the questions, the Court directs the witness to answer the questions. If the witness states before the Court, before going back to the grand jury, he will not answer in any event the Court can perhaps punish

right on the spot because there is a second contempt there, but if the witness simply goes back before the grand jury and if he answers the questions when he returns before the grand jury he is not, as we respectfully submit, not guilty of contempt. If he refuses to answer the question after being directed by the Court to answer, he is guilty of contempt. It is our position and I think we have made it clear in our answer. The answer has been presented and received by the Court?

THE COURT: And read by the Court."

After a lengthy examination and cross-examination of the prisoner, the contempt hearing was closed as follows:

"MR. NIEHOFF (Assistant Attorney General): I want to ask some more questions.

Q. I ask you now, Mr. Gendron, did you have any other business dealings with Louis Pooler than selling him merchandise?

A. I decline to answer on the ground it might incriminate me.

MR. NIEHOFF: I now take the position this man has waived his privilege to claiming self-incrimination because he has stated—he is a witness—and his counsel has stated for the record that he is associated with these fellows in conspiracy and now he is offering himself as a witness and has now opened the door and cannot claim self-incrimination, and I ask he be instructed to answer the question.

MR. GENDRON: The prosecutor knows very well it is not for the attorney to waive or claim the privilege of the witness. I think it is well established law. Furthermore this is not a grand jury investigation. This is a hearing in contempt. We have an issue here —

THE COURT: I think, Brother Niehoff, we will stop here. He admits being asked the questions and giving the answers which appear in this affidavit. In my opinion, it is sufficient to hold him in contempt, and I do that.

MR. GENDRON: We take exceptions.

THE COURT: All right. I sentence him, as I did some others, to six months in jail."

A mittimus was issued and the prisoner was committed to the Cumberland County jail on the 25th day of May, 1951, in execution of the foregoing sentence.

On the 9th day of June, 1951, the present writ of habeas corpus was issued and the respondent herein sought to justify his imprisonment of the prisoner under the mittimus or warrant of commitment issued in the contempt proceeding. Hearing was had on the writ of habeas corpus before the Superior Court. The presiding justice, in addition to the facts hereinbefore stated, made the following specific findings of fact:

"No writ of attachment, rule to show cause, citation, order of notice, or other process was issued by the Court upon the Affidavit of the foreman of the Grand Jury, Petitioner's Exhibit 1 (Cf. copy of docket entries in evidence herein as Petitioner's Exhibit 4), and no process of any kind was served on Respondent in the Contempt proceeding, the Petitioner herein, prior to commitment. Petitioner was present at the Contempt hearing and testified therein as set forth in Petitioner's Exhibit 3.

Petitioner, at no time, either before, during or after the Contempt hearing, was ordered or directed by the Presiding Justice to answer any question which he had declined to answer before the Grand Jury.

In the course of the proceedings of May 25 (Cf. page 1 of transcript in evidence here as Petitioner's Exhibit 3), the affidavit of the foreman of the Grand Jury was held, over defense objection, to constitute 'a prima facie case, at least' (of contempt), and, upon conclusion of the hearing, Petitioner herein was held in contempt for failure to

answer questions before the Grand Jury (Cf. Petitioner's Exhibit 1 herein).

After Petitioner's commitment for alleged contempt, there was found, presented and returned to Court, by the same Grand Jury before which he appeared as a witness under subpoena, two indictments against the Petitioner, one for Conspiracy to promote a lottery and one for possession of lottery tickets, both now standing continued without plea of guilty or not guilty to the September Term, 1951, of this Court."

This case is of novel impression in this State. We are here concerned with an essential power of the court, the power to punish for contempt. We are also here concerned with one of the fundamental liberties vouchsafed to the individual by the Constitution of this State, the privilege against self incrimination. The problem here presented is to reconcile the maintenance of the authority of the court to require the answer to questions propounded to a witness on the one hand, and the preservation of the right of the witness against self incrimination on the other hand.

The Constitution of this State in Art. I, Sec. 6 guarantees to the accused in all criminal prosecutions that "He shall not be compelled to furnish or give evidence against himself, x x x." By a similar provision in the Fifth Amendment of the Constitution of the United States it is provided that no person "shall be compelled in any Criminal Case to be a witness against himself, x x x." These provisions of the respective Constitutions have crystallized into absolute guaranties that common law privilege which is and always has been one of the cherished rights of the English and American peoples. These two constitutional provisions are so similar in nature and identical in purpose that precedent with respect to the construction of the one may well serve as precedent for the construction of the other. As said by this court in *State* v. *Gilman*, 51 Me. 206, 225:

> "Great care should undoubtedly be taken to protect the rights of the accused. His secret should not be extorted from him by the exercise of any inquisitorial power. He should be *fully informed of his legal rights,* when called upon or admitted to testify as a witness in a matter in which his guilt is involved. No officious party should be permitted to extract confessions from him, by operating upon his hopes or his fears." (Emphasis ours.)

Not only is the privilege against self incrimination available against direct disclosure of guilt on the part of the witness, but as said by the Supreme Court of the United States in *Counselman* v. *Hitchcock,* 142 U. S. 547, 585:

> "It is a reasonable construction, we think, of the constitutional provision, that the witness *is* protected 'from being compelled to disclose the circumstances of his offence, the sources from which, or the means by which, evidence of its commission, or of his connection with it, may be obtained, or made effectual for his connection, without using his answers as direct admissions against him.' *Emery's Case,* 107 Mass. 172, 182."

In the instant case the prisoner was a witness before the grand jury in obedience to subpoena. He was not a volunteer. He was before the grand jury by compulsion of law. Although it is the duty of the individual, when summoned before the grand jury, to give true answers to inquiries concerning facts within his knowledge, yet his duty to answer is always measured by his constitutional right to assert his privilege against self incrimination. The privilege against self incrimination is not a privilege against being subjected to inquiry. It is a privilege against the necessity of making disclosure of incriminating facts as heretofore defined. In cases where the privilege is validly asserted the right to require answer must yield thereto. As said by the Supreme Court of the United States in *United States* v. *White,* 322 U. S. 694, 698, quoted with approval in *Hoffman, Petitioner*

v. *United States* of America (May 28, 1951, 95 L. Ed. 729, 735) :

> "The immediate and potential evils of compulsory. self-disclosure transcend any difficulties that the exercise of the privilege may impose on society in the detection and prosecution of crime."

The practice of calling suspects before the grand jury and 'there examining them secretly and unaccompanied by counsel with respect to crimes of which they are suspect is not to be encouraged. It has not been the customary procedure in this jurisdiction. Under such practice it is all too easy to violate the constitutional rights of the individual. The mere fact that an accused was before the grand jury and there interrogated is not necessarily fatal to an indictment returned against him. It is unnecessary for the purposes of this opinion to lay down rules as to what will or will not vitiate an indictment found against a person called before the grand jury as a witness, nor with respect to the limitations upon the use against him of his answers before the grand jury. Suffice it to say it is a practice also fraught with danger to successful prosecution of one indicted as a result thereof. We are not here concerned with the validity of the indictments returned against the prisoner. We are here dealing with the validity of his imprisonment for his alleged contempt in refusing to answer questions propounded to him when before the grand jury. That question must be resolved in the light of the foregoing general principles.

We said in *Cushman Co. et al.* v. *Mackesy et al.*, 135 Me. 490 at 494:

> "The power of courts to punish for contempt has existed from earliest times. It was useless to establish courts unless they had authority to punish acts which might interrupt the orderly course of judicial procedure; and it was likewise futile

to confer jurisdiction to issue orders or injunctions without the power to enforce obedience to such decrees.

Contempts are of two kinds. There are those which occur in the presence of the court, which tend to bring the court into disrepute and interfere with the orderly conduct of judicial proceedings; and there are those, of which the court does not have first-hand information, for example those arising out of the failure to obey some order which the court has lawfully made. The procedure for punishment in the two cases is different. In the first the court may forthwith on its own initiative punish the offender; in the second the matter must be brought to the court's attention by some formal pleading and sentence may be imposed only after a hearing."

The *unjustifiable refusal* by a witness before the grand jury to answer a proper question propounded to him constitutes a contempt and may be punished as such.

The first question to be determined in this case is whether such contempts are classified and dealt with as having occurred in the presence of the court. The answer to this depends upon the nature of grand juries. As said by the Massachusetts Court in *Commonwealth* v. *McNary*, 140 N. E. 255, 256:

"The grand jury is a constituent part of the court. Presentment by grand jury in cases to which it is applicable is a part of the law of the land, and preserved by the Twelfth Article of the Bill of Rights of the Constitution. The grand jury is a branch or appendage of the court. It is organized and empowered to dischage its appropriate functions by virtue of being impaneled and sworn in open court as prescribed by law. It sits and deliberates under the authority of the court. It may at any time apply to the court for instructions and invoke its power for aid and protection in the performance of its duties. These attributes are essential in order to enable it to discharge its obligations and

do its work efficiently and without molestation in the protection of the public against crime and of the individual against oppression. Heard v. Pierce, 8 Cush. 338, 54 Am. Dec. 757; Commonwealth v. Bannon, 97 Mass. 214; Commonwealth v. Sanborn, 116 Mass. 61.

It is an inevitable consequence of these principles that the court has the power and is charged with the duty of punishing for contempt any one whose conduct interferes with or has a tendency to obstruct the grand jury. Such conduct is as much contempt, and punishable as such, as that which interferes with or has a tendency to obstruct the administration of justice in the courts in another form or manner. It may be as necessary to put forth the power of the court to protect itself against contempts committed against this instrumentality of justice as against others. It is a contempt of the court of which the grand jury is a part to obstruct its normal and legal functions."

Our grand jury system is but a continuation of that which existed prior to the separation and we accept the foregoing statement by the Massachusetts Court as a correct exposition of the law as it exists in this State. Therefore, the grand jury being a constituent part of the court, contempts in the presence of the grand jury are contempts in the presence of the court of which it is a part and are to be dealt with as such and as direct rather than constructive contempts.

Although the grand jury has no power in and of itself to punish for contempt, see 12 Am. Jur. 426, Sec. 53, and cases therein cited, it does have power to invoke the aid of the court in dealing with witnesses who refuse to answer questions propounded to them. For the purpose of invoking the aid of the court the jury may detain the witness and take him before the court. As said in *Heard* v. *Pierce,* 8 Cushing (Mass.) 338 at 344:

"in the language of lord Coke, 'it is against the office of the justices and the authority given them

> by law' that they should go to the jury or the witness; and it was therefore necessary, and the jury consequently had the implied power, to detain the witness and take him to the court. In truth, without the power to take refractory witnesses, or witnesses who honestly interpose unfounded objections to giving evidence, before the court, for its direction and aid, the grand jury would be wholly unable to perform the duties imposed upon them by law."

As said in Thompson and Merriam on Juries, Sec. 647, Page 699:

> "Witnesses before the grand jury are subject to the lawful authority and control of the court, in the same manner as are the witnesses before the trial jury. 'In contemplation of law,' said PARSONS, J., 'a grand jury are supposed to be personally present in court.' In view of the fact that the proceedings of the grand jury are conducted apart from the court, it is plain that when a witness, who has been duly summoned before this body, refuses to be sworn or to answer questions, or is otherwise contumacious, the grand jury may require their officer to take him into custody, and conduct him before the court to obtain the advice and decision of the court under the circumstances, as well as its compulsory power to enforce obedience. Such a witness may be fined by the court, or imprisoned for contempt."

The Massachusetts Court in *Heard* v. *Pierce, supra,* further stated on Page 345:

> "It may be proper to suggest as a matter of form that it may be suitable, whenever the grand jury have occasion to take a witness to the court, that the jury themselves should go into court with the officer and the witness, that the questions may be stated, or the decision of the court made, in the presence both of the jury and the witness."

We heartily approve this suggested procedure that the grand jury itself cause its officer to detain the witness until

he can be taken before the court, and that the proceedings thereafterwards be had in court in the presence of the witness and the grand jury. When before the court, the grand jury can then orally present to the court what has taken place, and the court can properly deal with the problem. This procedure has long been used in this State and was that followed in *this Court* when sitting at *nisi prius*.

However, cases may arise where the witness escapes from, or is allowed to depart from the presence of the grand jury, and for these or other reasons cannot be immediately taken into custody by the grand jury and brought before the court. In such cases the grand jury may make oral or written presentation to the court of the facts and request process from the court to bring the witness before the court, there to be dealt with. Even in such cases the better practice would be, the witness having been brought before the court, to have the proceedings before the court in the presence of the grand jury as well as of the witness, and the proceedings had upon the oral presentation by the grand jury to the court. If, however, the witness is to be tried upon a written presentment by the grand jury to the court, the presentment should be upon the oath of the grand jurors, to wit, their original oath, and signed by the foreman in the same manner as any other formal presentment by the grand jury to the court. .

In the instant case, while the complaint to the court purports to be that of the grand jurors, it is not made upon their oath or oaths, and it is supported not by the original oath of the grand jurors but by the personal oath of the foreman of the grand jury administered by a Notary Public. Such method of presentment by the grand jury is irregular in this jurisdiction. While it is unnecessary for us to decide whether the same would be fatal if the contemnor was actually being presented and tried upon the presentment itself, as would be the case if tried upon an indictment

returned, *State* v. *McAllister,* 26 Me. 374, better practice would indicate that all presentations of persons by the grand jury to the court should be upon their original oath or oaths, it being immaterial whether the same be "upon their oath" or "upon their oaths." *State* v. *Lang,* 63 Me. 215, 219. The original oath administered to grand jurors requires that they will "true presentment make of all matters and things" given them in charge. R. S., Chap. 135, Sec. 2. This oath once administered to the grand jurors prior to entering upon the duties or their office is sufficient. All presentments made upon their oath will be considered sworn presentments, and this applies to presentments for contempt. When presentment is made upon their oath as grand jurors, no further oath or verification of the presentment is necessary, in the absence of a specific statute requiring the same.

The alleged contempt in this case was in contemplation of law committed in the presence of the court. As such, no written complaint to the court was required. When a contempt is committed in the physical presence and actual view of the court, the court may summarily punish therefor. If the contempt is committed in the presence of the court or any of its constituent parts, but not in the actual view of the judge, all that is necessary for the prosecution of such contempt is that the contemnor be brought before the court, informed of the charge against him, given opportunity to defend against it and the facts constituting the alleged contempt be established beyond a reasonable doubt. As said in *In Re Caruba,* 51 Atl. (2nd) (N. J.) 446 at 459:

> *"Direct contempts are those usually referred to as contempts in the face of the court (in facie curiae).* But this does not mean that such contempts must be committed while the judge is presiding in open session. in the courtroom.' There is no doubt in my mind but that the Chancellor might have called Merrill and Jenkinson in the court room and inquired, 'Did you write this letter?' And upon an affirmative answer being given, could

> have said, 'Take him away, Sheriff', or 'Take him away, Sergeant'. (Five Knights' Cases, How. St. Tr. 111, 148). He could have committed them instanter. Oswald, 136. 'The law enables the court or a judge to send an offender to prison for contempt of court with a rapidity which may be described as "oriental" '. Oswald, 8. The Chancellor did not choose to act in this summary manner but followed the modern practice of issuing an order to show cause. But he nevertheless had the power."

In the instant case, the respondent was personally before the court, the proceedings continued at his request to enable him to defend, he was represented by counsel, the *facts* alleged to constitute the contempt were there made known to him and admitted by him. This was sufficient to confer jurisdiction upon the court to deal with the alleged contempt. That the affidavit was irregular, that no process was issued to bring the prisoner before the court, and that no rule was issued requiring him to show cause why he should not be held in contempt are immaterial. The irregularity of the affidavit, therefore, becomes of no importance. However, in contempts of the class where written complaint supported by affidavit *is necessary,* if such proceeding originate in the grand jury as such, and the complaint is made by the grand jury itself, it should be by presentment on their oath as grand jurors.

In the contempt case the presiding justice after the prisoner, the then respondent, was brought before him, ruled that the affidavit made out a *prima facie* case. This ruling was erroneous. Even a proper presentment by the grand jury in writing, unless its truth be admitted, must be established by proof. An affidavit is not such proof. This is an added reason why the proper practice in dealing with a witness in open court for alleged contempt in refusing to answer questions before the grand jury should take place in the presence of the grand jury. In such case the

facts may be reported to the court by the grand jury in the presence of the witness, and all proceedings had in the presence not only of the court but also of the grand jury and the witness. In this way the witness is given ample opportunity to hear the charge, and either deny the same or admit the facts and seek to justify. If he denies the charge in whole or in part, evidence should be taken out and the facts ascertained, the burden being upon the prosecution to establish the facts alleged to constitute the contempt beyond a reasonable doubt. The erroneous ruling by the court that the affidavit was sufficient to make out a *prima facie* case was cured by the prisoner. By offering himself as a witness and admitting being asked the questions and making the answers set forth in the affidavit, he himself supplied any lack of required proof. That lack of proof on the part of the plaintiff in a civil case, or on the part of the State in a criminal case may be supplied by the defendant when motion for nonsuit or directed verdict would otherwise have to be sustained is too elementary a proposition to need citation of authority therefor. The same rule applies in prosecutions for contempt.

If the facts be proven or admitted, the witness may attempt justification thereof. If, as here, the witness has refused to answer questions before the grand jury, he has a right to assert his privilege against self incrimination in justification of such refusal. If the answers would be self incriminatory, he cannot be compelled to answer the questions. This privilege against self incrimination may be asserted by the witness before the court as well as before the grand jury.

It is true that the privilege against self incrimination is a personal one. To be available to a witness it must be claimed and, being but a privilege, it may be waived. *State* v. *Wentworth*, 65 Me. 234. Failure to claim the privilege at the proper time may constitute a waiver.

The prosecution claims in this case that the prisoner when a witness before the grand jury waived his privilege against self incrimination as to all questions which he refused to answer without specifically asserting the privilege. This contention cannot be sustained. If the prisoner when before the grand jury in good faith refused to answer questions because he honestly believed that answers thereto would be self incriminatory without then stating the ground therefor, he had a right to assert his privilege when before the court in contempt proceedings. There is no evidence in the record presented to this court which would justify a conclusion that the prisoner in refusing to answer the questions or any of them was a refractory witness or one who was wilfully seeking to obstruct the functioning of the grand jury. The only proper conclusion that can be reached upon the record is that the prisoner believed in good faith that his answers to the questions propounded would be self incriminatory and that he refused to answer them on that ground. Such being the fact, he had the right to assert his privilege in the contempt proceedings even though he had not specifically asserted the same before the grand jury.

Refusal by a witness to answer a question before the grand jury because of an honest but mistaken belief on his part that the answer would be self incriminating does not constitute contempt. Nor does the fact that a witness did not state to the grand jury the ground for his refusal so made in and of itself make such refusal to answer a contempt. The grand jury is not the judge of the applicability of the privilege to questions directed to a witness. Whether the question is such that the answer thereto could be self incriminatory is a question for the court and until the witness has been taken before the court that question cannot be determined. The witness has the right to state his ground for refusing to answer when he was before the grand jury before and to the court. In other words, if his refusal before the grand jury was made in good faith, and

based upon his constitutional privilege, he can assert that privilege for the first time when he is brought before the court as for contempt. If the court rules against the privilege he cannot then be punished for contempt unless and until he has been given an opportunity to return before the grand jury and answer such question or questions as the court has ruled are not privileged and has directed him to answer. As before stated herein, it is the *unjustifiable refusal* to answer a question before the grand jury that constitutes contempt. The contumacious, intentional and wilfully obstructive refusal to answer questions before a grand jury by a refractory witness or one who is wilfully seeking to obstruct the functioning of the grand jury is unjustifiable and constitutes contempt. On the other hand, refusal to answer a question in order that the witness may in good faith interpose even an unfounded objection to making answer thereto, and obtain a ruling of court thereon is not unjustifiable, and is wholly within the rights of the witness. In such case to be unjustifiable and constitute contempt the refusal to answer must be made after the court has ruled upon the question of privilege and directed that answer be made.

If when before the court, upon being directed to answer the questions, the witness refuses to answer the same, he may then and there be punished for contempt.

If the witness returns before the grand jury and answers the questions pursuant to the direction of the court, the matter is closed. If, on the other hand, he persists in his refusal after returning before the grand jury, the grand jury may forthwith return the witness to the court and the court may summarily punish him for his contempt.

In this jurisdiction sentences for contempt by a witness who refuses to answer questions cannot be tested by exceptions. The power to punish for contempts of this nature is a plenary one and may be summarily exercised. Whether

the interrogatory be lawful or otherwise, or whether the commitment be justifiable or not, can be determined only on a writ of habeas corpus. If otherwise, the plenary common law power of the court or that conferred by statutes creating a summary process to elicit the truth by a disclosure of facts within the knowledge of the person inquired of, might, by the ingenuity of counsel, be wholly evaded. See *Bradley* v. *Veazie*, 47 Me. 85.

In the contempt proceeding against the prisoner the court ruled that as he admitted being asked the questions and giving the answers which appeared in the affidavit, that that was sufficient to hold him for contempt, and then proceeded to sentence him to six months in jail therefor. This ruling by the court was erroneous. There being no evidence in the record which would justify a finding that the refusal to answer the questions before the grand jury was contumacious or obstructive, the witness was entitled to have specific rulings as to whether or not he should answer each question which he had refused to answer. He was further entitled to an opportunity to answer such questions as the court ruled did not call for self incriminatory disclosures and which the court directed him to answer. This opportunity was not afforded him. The court made no ruling on the several questions as to whether or not the witness should answer the same, nor did it direct him to answer any of them or give him opportunity therefor. There was no contempt, and the sentence for contempt was not justified. As this ground is decisive in favor of the prisoner's right to a discharge upon the writ of habeas corpus, it is unnecessary for us to determine to which of the questions the prisoner was justified in asserting the privilege against self incrimination. An examination of the questions and the background against which they were asked and a consideration of the nature of the inquiry before the grand jury makes it apparent that nearly all, if not all, of the questions which the prisoner refused to answer could have been self

incriminatory, within the rule set forth in *Counselman* v. *Hitchcock, supra,* and that in all probability most of the answers, if truly given, would have been of that nature.

Although this prisoner is discharged because proper procedure safeguarding his constitutional rights was not followed, no injustice is being done. In accordance with the terms and purpose of the report and certification the prisoner should be enlarged.

*Writ sustained.*

*Prisoner ordered discharged.*