2014 ME 97

**STATE of Maine**

v.

**Dwight A. NORWOOD.**

**Docket No. Han–13–463.**

Supreme Judicial Court of Maine.

Submitted on Briefs: May 29, 2014.

Decided: July 31, 2014.

---

Jeffrey C. Toothaker, Esq., Ellsworth, for appellant Dwight Norwood.

Janet T. Mills, Attorney General, and Jamie R. Guerrette, Asst. Atty. Gen., Office of the Attorney General, Augusta, for appellee State of Maine.

Panel: SAUFLEY, C.J., and ALEXANDER, SILVER, GORMAN, and JABAR, JJ.

JABAR, J.

[¶ 1]  Dwight A. Norwood appeals from a judgment of conviction of unlawful trafficking of oxycodone (Class B), 17–A M.R.S. §§ 1102(1)(I), 1103(1–A)(A) (2013), unlawful possession of oxycodone (Class C), 17–A M.R.S. § 1107–A(1)(B)(4) (2013), and carrying a concealed weapon (Class D), 25 M.R.S. § 2001–A(1)(B) (2013), entered in the trial court (A. Murray, J.) following a jury trial.  Norwood argues that the trial court abused its discretion in declining to determine whether Norwood's witness validly asserted his Fifth Amendment privilege against self-incrimination when the witness declined to answer Norwood's questions.  Additionally, Norwood contends that the court erred in admitting evidence of an arrest of two individuals for possession of oxycodone allegedly purchased from Norwood.  We affirm the judgment.

## I.  BACKGROUND

[¶ 2]  Viewing the evidence in the record in the light most favorable to the State as the prevailing party, the jury rationally could have found the following facts beyond a reasonable doubt.  State v. Mitchell, 2010 ME 73, ¶ 2, 4 A.3d 478.

[¶ 3]  In the summer of 2012, the Maine Drug Enforcement Agency (MDEA) received information from Norwood's neighbor, a twenty-seven-year veteran of the Ellsworth Police Department, of unusual amounts of traffic coming and going from Norwood's home in Ellsworth.  After receiving this information, MDEA agents began conducting surveillance on Norwood's home.  Agents observed numerous visitors making stops at Norwood's residence.  The stops ranged in duration from thirty seconds to ten minutes.  On August 27, MDEA Agent Troy Bires observed a vehicle make a brief stop at Norwood's residence.  Agent Bires followed the vehicle to a nearby convenience store and, based on his suspicion that the vehicle's occupants were about to make a drug deal, arrested the occupants.  A search of the vehicle revealed twenty-six oxycodone pills in the glove compartment.

[¶ 4]  Two days later, MDEA agents followed Norwood to Bangor, where they believed he made a drug purchase.  When Norwood returned to Ellsworth, Agent Bires stopped the vehicle in Norwood's driveway and placed Norwood under arrest.  During a pat-down search incident to his arrest, Agent Bires discovered that Norwood was carrying thirty-five oxycodone pills in two containers and a twelve-inch sword concealed inside a cane.  Agent Bires then searched Norwood's residence pursuant to a search warrant, where he found three more oxycodone pills.  At trial, Brandon Long, who drove with Norwood to Bangor, testified for the State,

and confirmed that, in Bangor, Norwood had purchased the drugs the officers found during their pat-down search.

[¶ 5] The State filed a three-count complaint against Norwood alleging that he committed unlawful trafficking in and possession of oxycodone and carried a concealed weapon. During the trial, Norwood called Randy Archilles to testify that Long had fabricated his testimony against Norwood in order to secure a more favorable agreement with respect to Long's own criminal charges. When questioned by Norwood, however, Archilles, on the advice of counsel, declined to answer questions about Norwood's contact with Long and asserted his Fifth Amendment right against self-incrimination. Norwood objected, arguing that Archilles's assertion of the privilege was not justified, but the court denied his objection, reasoning that "it shouldn't be [the court's] role to overrule the advice given by an attorney to a client who wants to assert constitutional rights." The jury found Norwood guilty of all three counts. The court sentenced Norwood to two and one-half years' imprisonment for the trafficking and possession counts and six months' for the concealed weapon count, to be served concurrently. Norwood timely appealed. *See* M.R.App. P. 2(b)(2)(A).

## II. DISCUSSION

A. Validity of Witness's Fifth Amendment Privilege

[¶ 6] Norwood argues that the court erred in declining to evaluate the basis on which his witness—Archilles—asserted the Fifth Amendment privilege in response to Norwood's questions. We review the trial court's "determination of whether a witness has properly invoked the Fifth Amendment privilege" for an abuse of discretion. *State v. Butsitsi*, 2013

ME 2, ¶ 9, 60 A.3d 1254; *State v. Robbins*, 318 A.2d 51, 59 (Me.1974); *see also United States v. Castro*, 129 F.3d 226, 229 (1st Cir.1997) (explaining the standard of appellate review of trial courts' determinations on witnesses' invocation of the Fifth Amendment privilege).

[¶ 7] The Fifth Amendment guarantees both defendants and witnesses the right to refuse to give self-incriminating testimony. *See Butsitsi*, 2013 ME 2, ¶ 8, 60 A.3d 1254; *State v. Linscott*, 521 A.2d 701, 703 (Me.1987). The privilege against self-incrimination does not permit a witness to avoid making *any* disclosures; rather the privilege protects only those "disclosures which the witness reasonably believes could be used in a criminal prosecution [of the witness] or could lead to other evidence that might be so used." *State v. Vickers*, 309 A.2d 324, 327 (Me. 1973); *see also State v. Richard*, 1997 ME 144, ¶ 11, 697 A.2d 410.

[¶ 8] We have explained that an "injurious disclosure" is one in which the claimant has reasonable cause to believe that his answers may subject him to "a real danger of prosecution for a crime," *Linscott*, 521 A.2d at 703, not merely a "fancied or imaginary danger," *Robbins*, 318 A.2d at 57. Further, there may be "real danger" of prosecution although the elicited testimony is only indirectly incriminating. *See Hoffman v. United States*, 341 U.S. 479, 486, 71 S.Ct. 814, 95 L.Ed. 1118 (1951); *Vickers*, 309 A.2d at 327. As the United States Court of Appeals for the First Circuit has explained, "If a reply to a seemingly innocuous question reasonably will tend to sculpt a rung in the ladder of evidence leading to prosecution, the privilege appropriately may be invoked." *Castro*, 129 F.3d at 229 (citing *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814).

[¶ 9] In evaluating the witness's fear of prosecution, "[i]t is for the Justice, not the witness, to decide if the witness has reasonable cause under all the circumstances to fear the danger of self-incrimination." *Robbins*, 318 A.2d at 57; *see also Hoffman*, 341 U.S. at 486, 71 S.Ct. 814 ("[A witness's] say-so does not itself establish the hazard of incrimination. It is for the court to say whether his silence is justified."). In other words, it is the presiding judge who must determine whether the witness's fear of prosecution is "real and based on reasonable cause." *Vickers*, 309 A.2d at 327. "However, if the witness, upon interposing his claim, were required to prove the hazard in the sense in which a claim is usually required to be established in court, he would be compelled to surrender the very protection which the privilege is designed to guarantee." *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814. As a result, the court is often tasked with determining whether a claimant's silence is justified without knowing precisely the basis for invoking the privilege. "Th[is] task of determining whether or not the answer to a particular question would carry a real danger of incrimination is certainly one of the most difficult duties given to a trial Justice." *Robbins*, 318 A.2d at 58.

[¶ 10] In determining whether the claimant has validly invoked the privilege, the court need not ascertain with absolute certainty the precise basis for invoking the privilege. Instead, "it need only be evident from the implications of the question, in the setting in which it is asked, that a responsive answer to the question or an explanation of why it cannot be answered might be dangerous because

the injurious disclosure could result." *Richard*, 1997 ME 144, ¶ 11, 697 A.2d 410 (quoting *Hoffman*, 341 U.S. at 486–87, 71 S.Ct. 814). The judge evaluating the claim "must give the benefit of any reasonable doubt to the person claiming the privilege." *Vickers*, 309 A.2d at 327–28 (quotation marks omitted).

[¶ 11] From a practical standpoint, the moment it becomes apparent that a witness intends to invoke the Fifth Amendment privilege, in order to avoid any prejudice resulting from his or her Fifth Amendment claim, "the witness should be interrogated outside the hearing of the jury by counsel, and by the [c]ourt if necessary." *Robbins*, 318 A.2d at 57; *State v. Cross*, 1999 ME 95, ¶ 6, 732 A.2d 278 ("[C]alling a witness to the stand in the face of his expressed intention to invoke his privilege against self-incrimination would have produced no relevant evidence, while inviting the jury to engage in unwarranted and impermissible speculation." (quotation marks omitted)); M.R. Evid. 512(b).[1] An invocation of the privilege may be unjustified if the fear of self-incrimination is "so improbable or unrealistic that no reasonable person would suffer it to influence his conduct," *Vickers*, 309 A.2d at 328 (quotation marks omitted), or "if it clearly appears to the court that [the witness] is mistaken" in fearing prosecution, *Hoffman*, 341 U.S. at 486, 71 S.Ct. 814 (quotation marks omitted). The court "being governed as much by [its] personal perception of the peculiarities of the case as by the facts actually in evidence ... should evaluate the witness'[s] assertion of privilege on a question-by-question basis."

---

1. Additionally, if a person seeking to invoke the Fifth Amendment privilege against self-incrimination is concerned about making disclosures on the record with the prosecutors present, the court may opt to conduct the

inquiry in camera. *See generally Adam v. MacDonald Page & Co.*, 644 A.2d 461, 464 n. 8 (Me.1994); *United States v. Argomaniz*, 925 F.2d 1349, 1355 (11th Cir.1991).

*Robbins,* 318 A.2d at 57 (quotation marks omitted).

■■ [¶ 12] In this case, Norwood objected to Archilles's assertion of the Fifth Amendment privilege in response to three questions:

- "[W]hat did Brandon Long tell you?"
- "Did Brandon Long mention the DEA mentioning his child?"
- "Did he talk to you about being questioned by MDEA?"

After determining that it did not "have the full range of understanding of the [witness's] position that [the witness's legal counsel] does," the court deferred to the witness's decision, stating that "it shouldn't be [the court's] role to overrule the advice given by an attorney to a client who wants to assert constitutional rights."

[¶ 13] "But until [a] real danger is apparent, the court must remain sensitive of the reciprocal hazard that the right of a Defendant to obtain relevant testimony may be frustrated by a fancied or fraudulent claim of privilege." *Robbins,* 318 A.2d at 59. After learning that Archilles was invoking his Fifth Amendment rights, the court should have dismissed the jury and "evaluate[d] the witness'[s] assertion of privilege on a question-by-question basis." *Id.* at 57; *Vickers,* 309 A.2d at 327.

■■ [¶ 14] Nevertheless, we conclude that the court's failure to make an independent evaluation was harmless error. *See State v. York,* 1997 ME 156, ¶ 11, 705 A.2d 692; M.R. Crim. P. 52(a). Archilles's testimony—even if we assume that he could have been compelled to testify and that he would have testified as Norwood had hoped—would not have affected Norwood's substantial rights or contributed to the verdict. *State v. Johnson,* 2009 ME 103, ¶ 18, 982 A.2d 320 ("For errors involving constitutional rights, a reviewing court conducting a harmless error analysis must be satisfied that the record as a whole demonstrates beyond a reasonable doubt that the error did not affect the substantial rights of the defendant or contribute to the verdict obtained."). Norwood informed the court that "the sole purpose [of Archilles's testimony] was to impeach" the State's witness, Brandon Long. However, at the time that Norwood called Archilles to testify, Norwood had already called Long's credibility into question. During cross-examination, Long had admitted both that the MDEA agents had told him that he "probably won't be seeing [his] kid for quite awhile if [he] did not cooperate," and that he would have "said anything [he] had to say" to avoid criminal charges or secure a more favorable outcome for himself. Because Norwood had already elicited this testimony from Long himself, any error in declining to evaluate Archilles's claim of privilege, whose testimony was sought only to further impeach Long, was harmless.

**B. Admissibility of the Arrests of Other Individuals**

[¶ 15] Norwood also argues that the court erred in admitting evidence of the arrests of the occupants of a vehicle seen leaving Norwood's home on August 27, 2012, two days before the events giving rise to his own arrest, and the seized oxycodone pills found in the occupants' possession. Norwood contends that the court erred in determining that the probative value of the evidence substantially outweighed the danger of unfair prejudice to him. *See* M.R. Evid. 403.

■■■ [¶ 16] We review a trial court's decision to admit evidence pursuant to Rule 403 for an abuse of discretion. *See State v. Lipham,* 2006 ME 137, ¶ 9, 910 A.2d 388; *State v. Forbes,* 445 A.2d 8, 11 (Me.1982). "Rule 403 requires the trial court to weigh the probative value of evi-

dence offered by one party against the danger the evidence will unfairly prejudice the other party." *State v. Thongsavanh,* 2004 ME 126, ¶ 7, 861 A.2d 39. "The Rule does not protect a party from all prejudice, but only serves as a guard against *unfair* prejudice[;] ... [w]hat is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one." *Id.* (quotation marks omitted).

[¶ 17] In assessing the probative value of the evidence, the court must consider whether "the proffered evidence [is] relevant," in other words, whether it has "a 'tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence.'" *Forbes,* 445 A.2d at 11 (quoting M.R. Evid. 401). If the evidence is relevant, the court must then determine whether "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury." M.R. Evid. 403.

[¶ 18] Here, the evidence that three individuals possessed oxycodone pills after a recent visit to Norwood's home is relevant because Norwood was charged with trafficking in and possessing the same illegal drug. Although the State did not conclusively demonstrate that the pills

seized on August 27 came from Norwood, the jury could have reasonably inferred from other evidence presented, including the evidence concerning the numerous individuals coming and going from Norwood's home, that he was the source of the pills. The evidence of the individuals' arrest and the seizure of oxycodone in their possession has a tendency to show that pills found in Norwood's possession at the time of his arrest were pills that he possessed with the intent to sell. *See* 17–A M.R.S. § 1101(17) (2013) (defining "[t]raffick" in relevant part as possession of contraband items with the intent to sell).

[¶ 19] Because the evidence of the arrest of others, and their possession of oxycodone, was relevant and probative and was not unfairly prejudicial to Norwood, we conclude that the court did not abuse its discretion in admitting it into evidence. *See Lipham,* 2006 ME 137, ¶ 9, 910 A.2d 388; *Forbes,* 445 A.2d at 11.

The entry is:

Judgment affirmed.